## COMMONWEALTH *vs.* HOLLY KOZEC.

Essex.  November 7, 1985. — December 31, 1985.

Present: GREANEY, C.J., GRANT, & BROWN, JJ.

*Practice, Criminal,* Argument by prosecutor, Fair trial, Interpreter, Instructions
to jury. *Evidence,* Relevancy and materiality.

Where the prosecutor at a criminal trial, at which the defendant's credibility
was the central issue, made impermissible appeals during closing argu-
ment to the jury's sympathy; hypothesized an unproved scenario which
tended to support, in an improper manner, the complainant's version of
the incident by suggesting that the defendant was devious enough to
blame someone else for what she had done; and misstated evidence and
argued unfounded inferences with the apparent goal of depicting the
defendant as a promiscuous woman, the cumulative effect of the three
lines of closing argument, together with the judge's lack of curative
instructions, was so prejudicial to the defendant as to necessitate reversal
of her conviction of assault and battery by means of a dangerous weapon
upon a person sixty-five years of age or older. [362-365] BROWN, J.,
concurring.

At the retrial of an indictment for assault and battery by means of a dangerous
weapon upon a person sixty-five years of age or older, the complainant's
daughter, who had provided at the time of sentencing following the first
trial a "Victim Impact Statement" asking the judge to impose on the
defendant the maximum sentence allowed by law for the crime, was not
to be appointed as an interpreter under Mass.R.Crim.P. 41 unless no
other interpreter could be reasonably found. [365-366]

A judge at a criminal trial did not abuse his discretion when he gave the
jury essentially correct "consciousness of guilt" instructions but refused
to give them "consciousness of innocence" instructions. [366]

INDICTMENT found and returned in the Superior Court De-
partment on September 21, 1983.

The case was tried before *Peter F. Brady,* J.

*Richard Zorza,* Committee for Public Counsel Services, for
the defendant.

*Elin H. Graydon,* Assistant District Attorney, for the Com-
monwealth.

GREANEY, C.J. The complainant, a seventy-four year old man, and the defendant, Holly Kozec, a nineteen-year old woman, found themselves alone in an automobile late at night on July 9, 1983, on a rural road in Newburyport with the complainant talking sex for money. An argument erupted, and Kozec stabbed the complainant twice. Kozec was indicted for assault with intent to commit murder and for assault and battery by means of a dangerous weapon upon a person sixty-five years of age or older. G.L. c. 265, § 15B, as appearing in St. 1981, c. 678, § 2. A jury in the Superior Court acquitted her of the attempted murder charge and convicted her on the indictment for the other assault. She was sentenced to a term of imprisonment. Kozec has argued several claims of error on appeal. We deal in detail with only one claim, concluding that her conviction must be set aside because of prejudicial statements made by the prosecutor to the jury in his closing argument and other events which made the trial unfair.[1]

We first sketch the testimony at the trial. The complainant, who admitted to having had at least one beer, encountered Kozec outside the Tic Toc Lounge near Salisbury Beach late on the evening of July 9, 1983. He was a large man, standing 6'3" tall and weighing, according to testimony, somewhere between 225 and 280 pounds. Kozec was 5'3" tall and weighed between 110 and 120 pounds.

According to the complainant, Kozec did not appear intoxicated. She kept walking in front of him as he walked to his automobile, so he offered her a ride home to Amesbury. After they had driven a short distance, she asked him to turn around because she had forgotten to tell her boyfriend something. Heavy traffic prevented a U-turn, so the complainant turned right onto Old County Road (also known as Dump Road) and stopped his automobile. He had initially made no mention to the police, who later recovered a blood-soaked $10.00 bill from the front seat of his car, of any discussion between himself and Kozec about sex for money. At the trial, however, he testified that Kozec had let him fondle her breasts for $10.00,

---

[1] The prosecutor was not the assitant district attorney who is handling the appeal.

although he denied that he had given her the money in exchange for sexual intercourse. Later in the trial, a stipulation was read to the jury in which the complainant admitted to having given money to Kozec for sexual intercourse. He claimed before the jury that Kozec had demanded $50.00 for sex and that, when he balked at the price, she had attacked him with a knife. He further testified that Kozec was "awful powerful" and "threw [him] around like a little kid." After the stabbing, the complainant, bleeding profusely, fell out of the automobile. He vaguely recalled being driven to a hospital.

Kozec testified that, on the night of July 9, she had consumed an enormous quantity of alcohol (more than twenty drinks) and had used some cocaine. Too "wasted" to drive, she began seeking a ride home to Amesbury when she met the complainant outside the Tic Toc. When he offered to drive her, she decided that it was safe to accept a ride home from an elderly man. She stated that there was little or no traffic that night. According to Kozec, the complainant did not drive toward Amesbury but instead turned suddenly without a word onto Old County Road. In this rural location he stopped the automobile and offered her $20.00 if she would perform fellatio. When Kozec rejected the offer, he threatened to kill her, and a struggle ensued in the car. During the tussle, Kozec's purse opened and its contents spilled out, including a knife she carried. Kozec testified that she grabbed the half-open knife but could not recall stabbing the complainant with it. After the complainant fell from the automobile, she helped him to the passenger side. She claimed to have panicked when she saw the blood and drove the automobile back to the Tic Toc to get help from Frank Saporetto, who worked there as a bouncer.

Kozec testified that, after she returned to the Tic Toc, she attempted to persuade Saporetto to drive her and the complainant to the hospital. Saporetto, however, wanted to notify the police at a nearby police station. She refused this offer to get the police because the complainant's serious condition provided no spare time to wait for their arrival. Kozec proceeded to drive the complainant to the hospital herself. Kozec was at the hospital attempting to get the complainant out of the automobile when the police arrived and took charge.

Additional testimony about the incident came from other witnesses. Saporetto testified that he had known Kozec for several weeks. He stated that she had been in and out of the Tic Toc all evening on July 9 and that, when she left at 11:30 P.M. she was noticeably drunk. She returned about midnight, covered with blood, screaming that he had to help her drive a bleeding man to the hospital. Saporetto ran to the blood-spattered car and went to get the police because he felt the man inside would die without immediate assistance. Saporetto also testified that Kozec told him, "No cops," and ripped his sweatshirt in an unsuccessful effort to restrain him from obtaining police assistance.

Officer Edward Rice of the Newburyport police testified that he had been directing vehicles around an accident scene when he noticed a man's arm drippling blood dangling from the window of a passing automobile. He thought he saw blood on the car as well. He and his superior, Officer James Bateman, followed the automobile to the hospital unobserved. As they did, Officer Rice became convinced that the car's driver was intoxicated. Rice spent almost two hours with Kozec at the hospital. She was drunk and near hysteria. (Other police officers and a psychiatric nurse who testified characterized her behavior similarly.) Officer Rice also testified that Kozec dumped the contents of her purse in front of him while she was looking for her wallet and that he saw her knife and an open jar of Vaseline fall from it.

Richard Frazier testified that he was driving home from work at 11:50 P.M. on July 9 when he passed an automobile matching the complainant's stopped on Old County Road. He testified that as he drove slowly by he noticed a woman whose general description matched that of Kozec kneeling on the front seat looking down at an elderly man seated on the driver's side. Frazier could see into the automobile because its interior light was on, but in his testimony made no mention of having seen blood on or in the automobile. Frazier stopped to offer aid but drove on because when he started to back up, the automobile's interior light went off and its headlights came on. He could not identify either occupant.

As this sketch of the testimony suggests, the complainant and Kozec offered widely divergent testimony on what happened that night inside the automobile. The impartial witnesses — Saporetto, Officer Rice, and Frazier — provided peripheral details, but nothing that would firmly support either the complainant's or Kozec's version of what had happened. The case before the jury, therefore, came down to a test of credibility. On the one hand, the complainant admitted to soliciting sex from Kozec but claimed that when he had rejected Kozec's price she attacked him with a knife. On the other hand, Kozec painted a picture of a large, threatening man who had become upset about being refused sex and who had attacked her in a way that required the use of her knife in self-defense. These opposing contentions were put to the jury by means of instructions from the judge on the elements of the crimes charged and on the law of self-defense.

Additional information is relevant to the discussion of the prosecutor's closing argument. The complainant some years before the incident had had a laryngectomy and spoke with a stoma voice amplifier.[2] By the time of trial (which took place more than one year after the incident), the complainant suffered from several additional maladies unrelating to the stabbing. Cataracts had seriously impaired his vision, and he was almost deaf. He had lost about 100 pounds. He had also suffered a stroke that confined him to a wheelchair.

We now describe two parts of the prosecutor's final argument and other events at the trial. These items are set forth in separately lettered segments.

A. After general discussion about the jury's function in the case, the prosecutor zeroed in on the central issue of credibility, urging the jury to reject Kozec's testimony as untruthful and to adopt the complainant's testimony which he then summar-

---

[2] The judge appointed the complainant's daughter as an "interpreter" to repeat his answers to questions asked by counsel, as it was very difficult for the jury to understand the complainant's responses made through his voice amplifier. Her appointment was objected to by Kozec's trial counsel. We comment on the matter later in this opinion in connection with the issues which may arise at retrial.

ized. After recapitulating the complainant's testimony the prosecutor asked the jury: "Now, why should you believe that story from [the complainant]?" The prosecutor then proceeded to answer that question with the following line of argument:

> "Well, you have two different manners in which to analyze his testimony. Take first his demeanor. Now, as [the complainant] sat before you, he couldn't see because of cataracts. He couldn't hear apparently because of old age. He couldn't talk because of a laryngectomy, and he couldn't walk apparently because of a stroke, and on top of that as [his doctor] said, his wounds still hadn't completely healed. So, [the complainant] was by virtue of the physical circumstances that he finds himself in, many of which are not connected to the stabbing at all, a man who lives in his own little world. Do you think that a man who lives like that is going to be concerned enough about what people think of him and make up a story to cover something that he did that was wrong that night? Nothing worse could happen to [the complainant]. He doesn't have to worry —"
>
> DEFENSE COUNSEL: "Objection."
>
> THE JUDGE: "Overruled."
>
> THE PROSECUTOR: "If he was the aggressor that night, nothing could happen to him from telling you that fact and being candid about it. Well, let me put it another way. Isn't it your experience that people who are in their direst physical circumstances are in fact the most candid of all people, the people who bare their souls and tell you the things that they wouldn't tell you before?"

  B. Later in his summation, the prosecutor attempted to convince the jury that Kozec was the aggressor in the incident. The apparent purpose of so depicting her was to support the

complainant's testimony and undercut Kozec's contention that she had acted in self-defense. To accomplish this goal, the prosecutor developed the following hypothesis:

> "Well, but isn't there one big fact that indicates that she wasn't the aggressor? She took him to the hospital. Well, was it Miss Kozec's intent initially to take him to the hospital? You heard Mr. Frazier say that when he passed around the car, he stopped and he started to back up. He came within a few yards of the car. It looked like he was going to help out. Why didn't she tell him? Why not get him and have him take [the complainant] to the hospital? Instead she chose to drive to the beach. She knew where the police station was at the beach, not far from the Tic-Toc at all. She didn't drive there. She drove up to Frank Saporetto and she asked Frank to drive [the complainant] to the hospital. Was that a trap for Frank? Was he going to end up in the hospital alone with [the complainant] and have to —?
>
> DEFENSE COUNSEL: "Objection."
>
> THE JUDGE: "I'll allow it."
>
> THE PROSECUTOR: "And have to explain how that happened? Well, Frank Saporetto didn't take the bait in fact if it was bait. He said I'll go over to the police, and at that point, Miss Kozec knew that the police station was just around the corner and couldn't wait."[3]

---

[3] At this point, we note two other portions of the prosecutor's final argument.

As his argument developed, the prosecutor focused on the "physical facts" which he suggested to the jury corroborated the complainant's testimony. In that regard, he urged the jury to conclude that the open jar of Vaseline "suggest[ed] the possibility that Miss Kozec was prepared for sexual conduct when she got into the car." He further argued that Kozec "had to make a quick buck, and maybe she was generally a prostitute. The jar of Vaseline suggests that she might have been." (Kozec testified that she carried the jar of Vaseline with her for her sunburn and that the lid had

C. In his direct examination of Saporetto, the prosecutor brought out that Saporetto had known Kozec previously at a point when she had been a jello wrestler at the "Frolics." In cross-examination of Kozec, the prosecutor brought out that she had once wrestled another female in a ring of jello for about ninety seconds, at the end of which the "match" was "called off." In his examination of both Saporetto and Kozec, the prosecutor spent some time dwelling on the subject of jello wrestling and striving to get both witnesses to explain in detail what the activity consisted of. Prior to trial, defense counsel sought to exclude this evidence by means of a motion in limine, arguing that it had no relevance to the issues on trial and served only to portray Kozec in an unfair light.[4]

D. At the conclusion of the prosecutor's remarks to the jury, Kozec's trial counsel moved for a mistrial. In support of the motion, counsel referred to the several objections he had made to the argument, contending that it had been unfair and inflammatory, that the prosecutor had improperly attacked Kozec, and that he had impermissibly vouched for the complainant's credibility. The judge denied the motion for mistrial. The judge's final charge contained no curative instruction about the prosecutor's summation and confined itself to the usual general advice that the summations of counsel are not evidence.

1. We view the prosecutor's remarks, set forth in segment A above, as an impermissible appeal to the jury to decide the

popped open and fallen on the floor of the automobile during the struggle.) Kozec's trial counsel did not object to this argument.

Still later in his argument, the prosecutor asked: "Well, didn't [Kozec] look sorry when she saw [the complainant] in court when he testified?" He then went on to argue that "[w]hen [the complainant] came in the courtroom, it was clear that his version, the truth about what happened . . . on the Dump Road [would] come out. What [Kozec] was sorry about was that now you would know what really happened." Kozec's trial counsel objected to this argument, but his objection was overruled by the judge. Kozec's appellate counsel does not argue impropriety in this part of the prosecutor's summation.

[4] Although the Commonwealth argues that Kozec's trial counsel failed to object seasonably to the admission of the evidence at trial, the motion in limine and the objection to the judge's denial of the motion were all that were necessary to save Kozec's rights.

case on the basis of sympathy. While a prosecutor has a duty to argue the public's case aggressively, "[i]t is the evidence, not the sympathy, that must be the foundation of the jury's decision." *Commonwealth* v. *Smith,* 387 Mass. 900, 909-910 (1983). Unfair remarks in a case like this where credibility is the central issue are especially pernicious since they tend to undermine the foundation of the defense. The argument riveted the jury's attention on the spectacle of the complainant, who appeared before them confined to a wheelchair, suffering from the effects of a stroke, partially blind and deaf, and unable to speak unaided. We think the prosecutor unfairly sought to exploit the natural empathy any jury might feel for someone in the complainant's condition by suggesting that the complainant was truthful since "nothing worse could happen to him."

Further, we do not think that the prejudice inherent in the argument was palliated by the prosecutor's glancing reference to the fact that many of the complainant's physical impairments were not caused by the incident with Kozec. The prosecutor's continued emphasis, after defense counsel's objection to the argument had been overruled, on persons in "their direst physical circumstances" as "the most candid of all people," in our view, overcomes the palliative reference.[5]

The argument about Saporetto's involvement after the incident, set forth in segment B above, is also unfair. By means of the argument, the prosecutor sought to suggest to the jury

---

[5] We agree with the assistant district attorney arguing the appeal that a prosecutor has the right in final argument to bolster the credibility of the Commonwealth's witnesses. However, we do not find this case similar to *Commonwealth* v. *Fitzgerald,* 376 Mass. 402 (1978), as urged by the Commonwealth on appeal. In *Fitzgerald,* no objection to the prosecutor's allegedly offensive closing argument was made at the trial, leaving the argument to be examined on appeal for a substantial risk of a miscarriage of justice. In *Fitzgerald* (at 423-424), a possible inflammatory appeal to the jury's sympathy was mitigated by the prosecutor's telling the jury, in emphatic language, to decide the case solely on the facts, not on sympathy. In this case, the prosecutor gave no such caution. His overreaching also served to compound his reference to the complainant's physical circumstances during his opening statement (which was also objected to by defense counsel), and it focused attention on the prosecutor's initial questioning of the complainant about his physical infirmities.

that Kozec had attempted to embroil Saporetto by convincing him to take the complainant to the hospital, where he would be forced to explain how he had become involved with the seriously injured complainant. In fact, the argument was contradicted by the evidence.[6] Without any evidence to support it, the argument added another unfair mark against Kozec in the minds of the jury and tended to support, in an improper manner, the complainant's version of the incident by suggesting that Kozec was devious enough to attempt to blame someone else for what she had done.

Moreover, we see nothing in the fact that Kozec engaged in a jello wrestling match once on a dare, see segment C above, which would demonstrate her exceptional strength and support the complainant's testimony that she had thrown him about. There was nothing in the evidence which would even remotely show that participation in this form of activity required superior physical strength. The prejudice that could flow from the testimony was demonstrable, as it furthered the prosecutor's apparent goal of depicting Kozec in the minds of the jury as a promiscuous woman. We think "the probative increment achieved by introducing the incident was nugatory," *Commonwealth* v. *Yelle,* 19 Mass. App. Ct. 465, 471 (1985), and that it should not have been admitted.

The situation discussed to this point, augmented to some extent by the prosecutor's comments described in note 3, *supra,*[7]

---

[6] The Commonwealth points to one fragment of the testimony which it contends provided a factual basis for the argument. When the evidence is examined in context, it is clear that Kozec was requesting that Saporetto drive both her and the complainant to the hospital since she was too incapacitated to drive there by herself.

[7] We are willing to give the prosecutor the benefit of the doubt regarding the Vaseline argument since no objection was made to it by Kozec's trial counsel. We are doubtful, however, about the reasonableness of any inference that the jury could draw in this case from their common knowledge about Kozec having Vaseline available for purposes of sex. The argument should not be repeated at retrial.

We are also willing to give the prosecutor the benefit of the doubt on his argument pertaining to Kozec's demeanor since Kozec's appellate counsel has not questioned the argument. We note that while a prosecutor may, in certain circumstances, comment on a defendant's courtroom demeanor, see

and the judge's lack of curative instructions (which may not have remedied the problems in any event) leads us to conclude that the judgment must be reversed. No one of the events by itself is necessarily decisive. The whole picture, however, persuades us that the trial was unfair since the unfair material struck at the heart of the defense.[8] See *Commonwealth* v. *Villalobos,* 7 Mass. App. Ct. 905 (1979). See also *Commonwealth* v. *Shelley,* 374 Mass. 466, 470-471 (1978); *Commonwealth* v. *Clary,* 388 Mass. 583, 591 (1983).

2. We discuss briefly the issues that may arise at any retrial.

(a) Over defense counsel's objection, the judge appointed the complainant's daughter to act as his "interperter."[9] Although the judge did not know it at the time, the daughter would provide at the time of sentencing, a "Victim Impact Statement" which asked the judge "to impose [on Kozec] the maximum sentence allowed by law for [the] crime." There was an indication that disinterested personnel from the nursing home where the complainant resided were able to understand the complainant's speech and were available to act as interpreters.

Whenever possible, a person appointed as an interpreter under Mass.R.Crim.P. 41, 378 Mass. 918 (1979), should be

*Commonwealth* v. *Borodine,* 371 Mass. 1, 11 (1976), cert denied, 429 U.S. 1049 (1977); *Commonwealth* v. *Smith,* 387 Mass. 900, 907 (1983); *Commonwealth* v. *Connor,* 392 Mass. 838, 853 (1984), he cannot do so unfairly. As was noted in the *Borodine* case, *supra* at 11, a trial judge "might . . . conclude[] in his discretion to instruct the jury that no evidence of guilt arises when a defendant sits calmly in the courtroom." We have no way of knowing how Kozec may have looked when the complainant testified. Apparently she was not agitated or disruptive. The argument appears designed to portray Kozec as harboring consciousness of guilt and, simultaneously, to vouch for the complainant's "version [as] the truth about what happened." We find the argument troublesome.

[8] The assistant district attorney handling this appeal makes various arguments in an attempt to counteract this conclusion. Many of her arguments have been discussed and rejected above. We do not find any of the other arguments persuasive. In particular, we reject the argument that the weight of the evidence so favored the Commonwealth that the error was harmless. As has been noted, the evidence created a difficult issue of credibility for the jury, who rejected part of the Commonwealth's proof by acquitting Kozec of the attempted murder chage despite testimony that she had inflicted two deep, almost fatal, stab wounds near the complainant's heart.

[9] Someone who could understand and repeat the complainant's answers to questions was necessary because his stoma voice amplifier did not provide the jury, counsel or the judge with readily intelligible answers.

disinterested in the outcome of the case. In the circumstances of this case, we think the complainant's daughter should not be used as an interpreter at any retrial unless no other interpreter is reasonably available.

(b) The judge did not abuse his discretion when he gave the jury essentially correct "consciousness of guilt" instructions but refused to give them "consciousness of innocence" instructions. See *Commonwealth* v. *Martin,* 19 Mass. App. Ct. 117 (1984). Contrary to Kozec's contention, the *Martin* decision does not express a preference for a consciousness of innocence instruction. Rather, it suggests that instructions on the issue of consciousness of guilt might best be dealt with by leaving the jury to evaluate the evidence on the issue without elaboration by the judge in final instructions. *Id.* at 123. We leave the entire matter of the handling of consciousness of guilt to the sound discretion of the judge who presides at retrial.

(c) The question whether the judge who presides at retrial should, if Kozec is convicted, obtain a presentencing report before imposing sentence is covered by Mass.R.Crim.P. 28 (d) (2), 378 Mass. 899 (1979). See *Osborne* v. *Commonwealth,* 378 Mass. 104, 115 (1979); *Commonwealth* v. *Murray,* 4 Mass. App. Ct. 493, 496 (1976).

*Judgment reversed.*

*Verdict set aside.*

BROWN, J. (concurring). At the risk of adding a few extra pages to our reports, I am compelled once again to make note of that all too prevalent occurrence in criminal trials — the prosecutor snatching defeat from the jaws of victory. It is patently obvious from the majority opinion, in which I fully concur, that the principal errors the defendant claims occurred at trial could have been avoided by a prosecutor who was striving for a fair trial. Cf. *Commonwealth* v. *Paiva,* 16 Mass. App. Ct. 561, 563 (1983). All these errors appropriately may be denominated self-inflicted wounds.

I think that the "snatch defeat" language should be appearing for its final unwelcome encore. Either the prosecutors are going to do it right[1] or they will not be able to do it at all. For action which has been suggested in another jurisdiction, see *American Auto Assn., Inc.* v. *Rothman,* 104 F. Supp. 655, 656 (S.D. N.Y. 1952).[2]

The closing argument was unfair and unprofessional. Here fifteen minutes of thoughtful and careful preparation would have saved the Commonwealth much time and expense. The admonition not to sail "unnecessarily close to the wind" (*Commonwealth* v. *Redmond,* 370 Mass. 591, 597 [1976]) is in direct response to such careless overreaching in final argument. It cannot be gainsaid that proper, as well as effective, argument requires careful preparation. See, e.g., *Commonwealth* v. *Haas,* 373 Mass. 545, 557 & n.11 (1977). See also *Commonwealth* v. *Earltop,* 372 Mass. 199, 206 (1977) (Hennessey, C. J., concurring).

---

[1] For an example of sound professionalism, see *Commonwealth* v. *Woolridge,* 19 Mass. App. Ct. 162, 164 & 173 (Brown, J., concurring) (1985).

[2] "This opinion should be filed separately in the office of the Clerk of this Court, and indexed against the name of the [prosecutor], so that, in the event that his professional conduct in any other connection shall become a subject of inquiry, this case and this record can be referred to for such instruction as it may yield." *Ibid.*